UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| STARR INDEMNITY AND LIABILITY COMPANY, dba STARR INSURANCE COMPANIES as Subrogee of GLF AIR, LLC., and 60-206, LLC, <br><br>Plaintiffs, <br><br>v. <br><br>SIGNATURE FLIGHT SUPPORT CORPORATION, a Nevada corporation; SIGNATURE FLIGHT SUPPORT, LLC, a Nevada limited liability company; SIGNATURE FLIGHT SUPPORT OF NEVADA, INC., a Nevada corporation; DOES 1 – X, inclusive, and ROW CORPORATIONS 1 – X, inclusive, <br><br>Defendants. | Case No. 2:22-cv-02011-LRH-CLB <br><br> ORDER |

Before the Court are cross motions for summary judgment. Plaintiff Starr Indemnity and Liability Company ("Starr") filed its motion for summary judgment (ECF No. 70), Defendant Signature Flight Support, LLC ("Signature") responded in opposition (ECF No. 74), and Starr replied (ECF No. 76). Signature also filed a motion for summary judgment (ECF No. 71) to which Starr responded in opposition (ECF No. 73) and Signature replied (ECF No. 75). For the reasons articulated herein, the Court denies Starr's motion and grants Signature's motion.

**I.   BACKGROUND**

This subrogation matter stems from property damage done to a privately owned non-commercial aircraft while it was parked and stored at a third-party aircraft facility. At all relevant

1

times to this litigation, Patrick Marino ("Marino") owned a 2000 Bombardier 60 Learjet bearing Federal Aviation Administration ("FAA") Registration No. N448GL (the "Learjet") through 60-206, LLC, his limited liability company. ECF No. 70-1 at 4, 5; ECF No. 71-7 at 4. After purchasing the Learjet, Marino informally used a friend-of-a-friend Kevin Young ("Young") and his company GLF Air, LLC—an aircraft management and consulting company specializing in Gulfstream aircraft management—to insure and make the Learjet operational while Marino shopped around for a management company. ECF No. 70-1 at 130, 190, 191. Once operational, Young informally contacted an independent contractor pilot Leonardo Gomez to pilot the Learjet when needed by Marino. *Id*. at 191, 192. On several occasions, however, Gomez arranged for other independent contractor pilots to fly the Learjet. ECF No. 70-2 at 4. In May of 2019, Gomez arranged for independent contractor pilot Thomas Troncone to fly Marino and others on the Learjet from Florida to Las Vegas, the flight underlying this litigation. *Id*. at 7; ECF No. 70-1 at 74, 85. Upon arrival in Las Vegas, Troncone parked the Learjet at a fixed base operation ("FBO") operated by Signature ("Signature's Las Vegas FBO") and signed a Landing Card.[1] ECF No. 71-2 at 2; ECF No. 71-9 at 5–8. The Learjet was stored at Signature's Las Vegas FBO overnight and damaged the following day when Signature employees towed another aircraft which hit the Learjet. *See* ECF No. 40-2. At the time the property damage occurred, GLF Air, LLC arranged for the Learjet to be insured pursuant to its fleet insurance policy, a policy issued by Starr (Policy No. 1000229146-03). ECF No. 70-1 at 238, 198, 199.

Armed with this background, the facts to which the parties have jointly stipulated are more properly framed:

> This matter involves an incident that occurred on or about May 18, 2019, at the Harry Reid International Airport, located in Las Vegas when employees of [Signature], a [FBO], were towing a Citation 650 bearing [FAA] Registration No. N820FJ ("Citation") when the wingtip of the Citation made contact with [the Learjet], causing damage to [the Learjet's] baggage door ("Incident"). At the time of the Incident, [the Learjet] was owned by 60-206, LLC and was insured by [Starr]. Prior to the Incident, [the Learjet's] pilot signed [Signature's] Landing Card while

---

[1] Signature describes an FBO as an airport terminal for non-commercial, general aviation airliners such as private, chartered, and government aircrafts. ECF No. 71 at 2. According to Signature, FBOs lease property from airports and provide general aviation services for non-commercial aircrafts. *Id*. After a non-commercial aircraft landing at an airport, the aircraft then taxis to an FBO, parks, unloads its passengers and cargo, and receives any requested aviation services. *Id*. at 2, 3.

at [Signature's Las Vegas FBO], which provided, in part, that "under no circumstances shall Signature be liable to the customer for indirect, consequential, special or exemplary damages, whether in contract or tort (including strict liability and negligence), such as, but not limited to, loss of revenue, loss of use or anticipated profits, diminution or loss of value, or costs associated with substitution or replacement aircraft." … As a result of the Incident, Starr alleges that its insureds incurred $61,277.21 to repair [the Learjet] (the "Repair Damages") and $279,413.23 of other damages for loss of use and rental aircraft expenses ("Other Damages"), all of which were paid by Starr pursuant to the insurance policy for [the Learjet] … The parties have resolved [Starr's] claims for the Repair Damages, and on September 12, 2022, the parties filed the Stipulation to Dismiss with Prejudice All Claims Regarding the Repair Damages… On September 13, 2022, the Court granted the stipulation… As to the alleged claim for Other Damages, the parties agree that the facts of the Incident are not in dispute, and that liability of [Signature] as to the Other Damages, is contingent only on the enforceability of the terms of the Landing Card. If there is no liability because of the Landing Card, then there will be no need to conduct discovery on damages. Once liability is determined, damages can be the focus of the case if liability is found.

ECF No. 40 at 2, 3. Thus, at primary dispute here is the enforceability of the fourth footnote clause in the Landing Card that the Learjet's contract pilot Troncone executed upon arrival to Signature's Las Vegas FBO.

In December 2019, Starr demanded that Signature pay for the post-accident costs its insureds incurred (ECF No. 18 at 3) but Signature rejected the demand. Subsequently on January 31, 2022, Starr filed an original complaint in the Second Judicial District Court of the State of Nevada in and for the County of Washoe. ECF No. 1 at 3. After correcting plaintiff-related party information, Starr filed an amended complaint on March 28, 2022, in which it alleges that Signature negligently cared for and maintained the Learjet. ECF No. 1-2. In April 2022, Signature then removed the matter pursuant to 28 U.S.C. §§ 1332, 1441, and 1446. ECF No. 1. Upon removal, the matter was randomly assigned to the Honorable James C. Mahan of the District of Nevada's unofficial Southern Division until it was ordered "administratively closed and transferred to the unofficial northern division in Reno for further action per LR IA 1-8(c)[.]" ECF No. 5. After transfer, the matter was reassigned to the Honorable Larry R. Hicks and Magistrate Judge Carla L. Baldwin of the District of Nevada's unofficial Northern Division. ECF No. 17. After reassignment, Starr filed a motion to remand (ECF No. 18) and Signature filed a motion for intradistrict transfer back to the unofficial Southern Division (ECF No. 33). The Court denied Starr's motion to remand and granted Signature's motion for intradistrict transfer but ordered that the action remain before the two unofficial Northern Division courts. ECF No. 41.

On November 7, 2022, Magistrate Judge Carla L. Baldwin granted the parties' joint stipulation to bifurcate liability and damages. ECF No. 40. As a result of bifurcation, the only issue remaining before the Court is the issue of liability, namely the enforceability of the Landing Card that the Learjet's pilot signed upon arrival at Signature's Las Vegas FBO and, consequentially, whether Signature can be held liable for the Other Damages. ECF No. 40 at 3, 4. On July 18, 2023, both Starr and Signature filed competing motions for summary judgment on the issue of the Landing Card's enforceability and Signature's possible liability for the Other Damages. ECF Nos. 70, 71. The motions are addressed below.

## II.   LEGAL STANDARD

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, affidavits or declarations, stipulations, admissions, and other materials in the record show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In assessing a motion for summary judgment, the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001).

The moving party bears the initial burden of informing the court of the basis for its motion, along with evidence showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On those issues for which it bears the burden of proof, the moving party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)); *see also Idema v. Dreamworks, Inc.*, 162 F.Supp.2d 1129, 1141 (C.D. Cal. 2001).

To successfully rebut a motion for summary judgment, the nonmoving party must point to facts supported by the record which demonstrate a genuine issue of material fact. *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 738 (9th Cir. 2000). A "material fact" is a fact "that might affect

the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). A dispute regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. "The mere existence of a scintilla of evidence in support of the [party's] position [is] insufficient" to establish a genuine dispute; "there must be evidence on which the jury could reasonably find for the [party]." *Id.* at 252.

"A moving party without the ultimate burden of persuasion at trial … has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "In order to carry its burden of production, the moving party must produce either evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Id.*

### III. DISCUSSION

In evaluating cross motions for summary judgment, the Court "must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011); *see also Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001) ("the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them"). Furthermore, the Court must consider each motion "on its own merits" to determine whether any genuine issue of material fact exists. *Riverside Two*, 249 F.3d at 1136. While the Court considers each motion separately and on its own merits, Starr and Signature offer nearly identical arguments in support of their own motion and in response to the opposing party's motion. For this reason, the Court's written analysis of the motions is combined.

///

///

///

A.   **The Court denies Starr's motion for summary judgment (ECF No. 70) and grants Signature's motion for summary judgment (ECF No. 71) because there is only one inference that can be made from the undisputed facts: the pilot had apparent authority to execute the Landing Card, an enforceable contract, which included a valid limitation of liability clause, upon the Learjet's arrival to Signature's Las Vegas FBO.**

In sum of its motion, Starr argues that summary judgment should be granted in its favor based upon the following: (1) there is no contract because Marino and 60-206, LLC are not parties to the Landing Card; (2) the footnote at issue is an exculpatory clause that is disfavored and unenforceable; (3) the pilot did not have apparent authority to bind the Learjet owner; and (4) Signature's apparent authority reliance was not reasonable. *See generally* ECF No. 70. In opposition to Starr's motion and in support of its own motion, Signature argues that the pilot Troncone was an agent of the Learjet's owner, 60-206, LLC, or its management company, GLF Air, LLC, and possessed actual and apparent authority to bind them to the Landing Card's terms. ECF No. 71 at 10–16; ECF No. 74 at 13, 14. As to Starr's contract arguments, Signature argues that (1) 60-206, LLC is a party to the Landing Card because the Learjet's FAA tail number appears on the Landing Card multiple times; (2) the Landing Card itself is not an adhesion contract; and (3) the footnote at issue in the Landing Card is not an unenforceable exculpatory clause but rather an enforceable limitation of liability clause. ECF No. 71 at 16, 17; ECF No. 74 at 9–13.

First, the Court is unpersuaded by Starr's argument that the Landing Card is not a contract to which 60-206, LLC or Marino are parties because neither appears by name on it. ECF No. 70 at 18. It is undisputed that N448GL, the Learjet's FAA Registration Number, appears at least three times on the Landing Card, two of which appear in the largest, most bolded, and noticeable font. *See* ECF No. 70-1 at 2. It is further undisputed that the Learjet bearing FAA Registration No. N448GL was registered to and owned by 60-206, LLC when the Landing Card was executed and when the Incident occurred. *See* ECF No. 70-1 at 4, 5. Thus, because its property is listed on the Landing Card, 60-206, LLC is a party to its terms. The fact that GLF Air, LLC, an entity that Marino and 60-206, LLC informally used to manage the Learjet, is also identified on the Landing Card strengthens the conclusion that Marino and 60-206, LLC are parties to the Landing Card. Lastly, Marino confirmed that he was a passenger on this specific flight (ECF No. 70-1 at 130)

and the independent contract pilots deposed here testified that when a pilot executes a FBO landing card for a flight carrying the aircraft owner, the pilot executes the landing card on behalf of the aircraft and the owner (ECF No. 71-8 at 16, 17; ECF No. 71-10 at 19, 20). Thus, any argument that the Landing Card at issue here was unrelated to Marino or 60-206, LLC or somehow unbinding on them because they are not listed by name is misplaced and unsupported by the undisputed facts.

The Court is similarly unpersuaded by Starr's argument that the footnote at issue in the Landing Card is an unenforceable exculpatory clause that should be void as against Nevada public policy. ECF No. 70 at 18–23. The footnote at issue in the Landing Card states:

> The parties agree that under no circumstances shall Signature be liable to the customer for indirect, incidental, consequential, special or exemplary damages, whether in contract or tort (including strict liability and negligence), such as, but not limited to, loss of revenue, loss of use or anticipated profits, diminution or loss of value, or costs associated with substitution or replacement aircraft.

ECF No. 71-2 at 2. While Starr is correct that contractual exculpatory clauses are disfavored in the law and strictly construed by Nevada courts, *Moffitt v. 24 Hour Fitness USA, Inc.*, Case No. 2:12- CV- 00469-PMP, 2013 WL 1080441, at *2 (D. Nev. Mar. 14, 2013) (citing *Agric. Aviation Eng'g Co. v. Bd. of Clark Cnty. Comm'rs*, 106 Nev. 396, 399–400 (1990)), contractual limitation of remedies clauses are allowable under Nevada Revised Statute § 104.2719 and that is the type of clause at issue here. The language of the footnote does not operate to exculpate or excuse Signature from any and all liability, but rather limits the type of damages recoverable. In Nevada, consequential damages "may be limited or excluded unless the limitation or exclusion is unconscionable." Nev. Rev. Stat. § 104.2719(3). Generally, a limitation of consequential damages clause is prima facie unconscionable "when [it] preclude[s] consumers from recovering consequential and incidental damages due to personal, rather than purely economic, injuries." *Skiles v. Reno Dodge Sales, Inc.*, Case No. 2-08-CV-01365-RLH-PAL, 2009 WL 10710370, at *3 (D. Nev. Jan. 28, 2009) (citing Nev. Rev. Stat. § 104.2719(3)). When a limitations clause is related to commercial loss not personal injury or damage, the case here, the burden to prove unconscionability is on the party seeking to invalidate the contract as unconscionable. *Bill Stremmel Motors, Inc. v. IDS Leasing Corp.*, 89 Nev. 414, 418 n.3 (1973).

///

"A contract is unconscionable only when the clauses of that contract and the circumstances existing at the time of the execution of the contract are so one-sided as to oppress or unfairly surprise an innocent party." *Id*. at 418 (citations omitted). In Nevada, both procedural and substantive unconscionability are required to invalidate a contract or contractual provision as unconscionable. *U.S. Home Corp. v. Michael Ballesteros Tr.*, 134 Nev. 180, 190 (2018) (citing *Burch v. Second Jud. Dist. Ct. of State ex rel. Cnty. of Washoe*, 118 Nev. 438, 443 (2002) ("Generally, both procedural and substantive unconscionability must be present in order for a court to exercise its discretion to refuse to enforce a contract or clause as unconscionable")).

Substantive unconscionability is present when a contract "contains oppressive terms or is one-sided." *Mohazzabi v. Wells Fargo, N.A.*, Case No. 2-18-CV-02137-RFB-VCF, 2019 WL 4675768, at *4 (D. Nev. Sept. 25, 2019) (citing *Gonski v. Second Judicial Dist. Court of State ex rel Washoe*, 245 P.3d 1164, 1169 (Nev. 2010), overruled on other grounds by *U.S. Home Corp.*, 134 Nev. 180). Procedural unconscionability deals with whether a party "lacks a meaningful opportunity to agree to the [contract or] clause terms either because of unequal bargaining power, as in an adhesion contract, or because the clause [or contract] and its effects are not readily ascertainable upon a review of the contract." *D.R. Horton, Inc. v. Green*, 120 Nev. 549, 554 (2004), overruled on other grounds by *U.S. Home Corp.*, 134 Nev. 180. Procedural unconscionability is supported by the "use of fine print or complicated, incomplete or misleading language that fails to inform a reasonable person of the contractual language's consequences." *Id*.

Here, Starr has failed to offer evidence that the limitation of incidental and consequential damages footnote at issue in the Landing Card is procedurally unconscionable. Although the footnote font is slightly smaller than the rest of the Landing Card's font, it is undisputed that Signature presented the Landing Card to Troncone who testified he did not read it. Signature's policy is to offer the customer time to read and execute a landing card upon arrival. The customer receiving the landing card can then choose to sign or not sign and, regardless of execution, Signature still provides the services requested by the customer. Here, Troncone was given the opportunity to review the Landing Card and ascertain the effects of the footnote at issue. Additionally, Troncone did not have to execute the Landing Card and Signature would have

provided Learjet with any services he requested on behalf of the Learjet, 60-206, LLC, and Marino. Such undisputed facts place Troncone in a position of equal, not unequal, bargaining power. The mere fact that Troncone testified he did not read the Landing Card and that Marino testified he has never seen a landing card do not provide a proper basis on which procedural unconscionability can be supported. Finally, the language of the footnote at issue is clear, not misleading, or complicated and unambiguously limits any recoverable incidental and consequential damages. "Generally, when a contract is clear on its face, it 'will be construed from the written language and enforced as written.'" *Canfora v. Coast Hotels & Casinos, Inc.*, 121 Nev. 771, 776 (2005) (citing and quoting *Ellison v. C.S.A.A.*, 106 Nev. 601, 603 (1990)). With such clear limiting language, a simple reading of the footnote would inform a reasonable person of the contractual language's legal consequences. Moreover, the fact that the Landing Card was not offered on a "take it or leave it" basis defeats any argument that the Landing Card is an adhesion contract. Accordingly, the Court finds that Starr has failed to offer evidence that the Landing Card's footnote is procedurally unconscionable. Because at least some procedural unconscionability is required to render a contract unenforceable due to unconscionability, *see U.S. Home Corp*, 134 Nev. at 190, the Court finds the footnote at issue is an enforceable limitation of liability clause to which Marino and 60-206, LLC are parties. *See Hunt v. Zuffa, LLC*, Case No. 2-17-CV-00085-JAD-VCF, 2019 WL 6255478, at *2 (D. Nev. Nov. 22, 2019) (finding that a contractual provision barring consequential damages was valid partly because the party claiming unenforceability failed to demonstrate how the clause was unconscionable) aff'd in part, rev'd in part on other grounds and remanded, Case No. 19-17529, 2021 WL 4355728 (9th Cir. 2021).

With a valid limitation of liability clause and contract established, the Court turns to the question of agency to determine whether the Troncone had authority to bind Marino, 60-206, LLC, or GLF Air, LLC to the terms of the Landing Card. Typically, an "agency relationship" exists when one "hires another" and "retains a contractual right to control the other's manner of performance." *Grand Hotel Gift Shop v. Granite St. Ins. Co.*, 108 Nev. 811, 815 (1992). In such a case, the principal "is bound by acts of its agent" while the agent acts "in the course of his employment" and the principal "is liable for those acts within the scope of the agent's authority."

*Nevada Nat. Bank v. Gold Star Meat Co., Inc.*, 89 Nev. 427, 429 (1973) (citations omitted). However, and agent-principal relationship does not always require direct employment as courts have found independent contractors may be agents. *See, e.g.*, *Upper Deck Co. v. Matt Const., LLC*, 128 Nev. 941, 2012 WL 6681924, *1, 2 (2012) (affirming district court's finding that an independent design consultant was an agent of a condominium owner). "To bind a principal, an agent must have actual authority, express or implied, or apparent authority." *Dixon v. Thatcher*, 103 Nev. 414, 417 (1987); *see also Salyers v. Metro. Life Ins. Co.*, 871 F.3d 934, 940 (9th Cir. 2017) (citing Restatement (Third) of Agency § 2 intro. note (2006)).

Apart from the contractual disputes already addressed, the parties primarily dispute whether the pilot Troncone was an agent of Marino, 60-206, LLC, or GLF Air, LLC as to bind them to the limitation of liability footnote in the Landing Card. Signature argues that the pilot was an actual and apparent agent and, as such, possessed authority to bind (ECF No. 71 at 2; ECF No. 75 at 3) while Starr argues that the pilot did not have actual or apparent authority to bind (ECF No. 73 at 7–10). "[A]lthough the existence of an agency relationship is a question of fact, whether there is sufficient evidence of such a relationship so as to preclude summary judgment is a question of law." *PetSmart, Inc. v. Eighth Jud. Dist. Ct. in & for Cnty. of Clark*, 137 Nev. 726, 730 (2021) (citation omitted). Put alternatively, "existence of an agency relationship is generally a question of fact for the jury if the facts showing the existence of agency are disputed, or if conflicting inferences can be drawn from the facts" but a "question of law exists as to whether sufficient competent evidence is present to require that the agency question be forwarded to a jury." *Schlotfeldt v. Charter Hosp. of Las Vegas*, 112 Nev. 42, 47 (1996).

After careful review of the record, the Court finds that there is insufficient competent evidence present to require that the question of agency in this matter be forwarded to a jury. Here, there is no genuine issue as to whether the pilot Troncone had apparent authority to bind the Learjet owner to the terms of the Landing Card and, moreover, the facts showing the existence of agency are not in dispute. "'Apparent authority' arises when a principal holds his agent out as possessing certain authority or permits him to exercise or to represent himself as possessing such authority under circumstances that would estop the principal from denying its existence." *Gold Star Meat*,

89 Nev. at 429 (citation omitted). The party claiming apparent agency as a basis for contract formation "must prove (1) that he subjectively believed that the agent had authority to act for the principal and (2) that his subjective belief in the agent's authority was objectively reasonable." *Great Am. Ins. Co. v. Gen. Builders, Inc.*, 113 Nev. 346, 352 (1997) (citation omitted). Reliance is not reasonable where the party claiming apparent agency closes his or her eyes to warnings or inconsistent circumstances. *PetSmart*, 137 Nev. at 733 (citation omitted). "Absent a showing of third party reliance on some conduct of the alleged principal, there can be no apparent agency." *Hunter Min. Lab'ys, Inc. v. Mgmt. Assistance, Inc.*, 104 Nev. 568, 571 (1988) (citation omitted).

Here, Signature has shown, and Starr has failed to genuinely dispute, that it subjectively believed Troncone had authority to act for Marino, 60-206, LLC, and GLF Air, LLC, and that its subjective belief in Troncone's authority was objectively reasonable. The following facts are undisputed in the record: (1) on the day of the Incident, the Learjet was owned by Marino through his limited liability company 60-206, LLC; (2) through an informal and friendly deal, GLF Air, LLC insured the Learjet with a Starr insurance policy and arranged independent contract pilots for the Learjet through aviation acquaintance Gomez; (4) for this particular Las Vegas-bound flight, Gomez arranged for Troncone, an independent contractor pilot, to fly the Learjet; (5) Marino was a passenger on this particular flight; (6) upon arrival to Signature's Las Vegas FBO, Signature presented Troncone with the Landing Card which he executed; and (7) the Landing Card executed by Troncone included a footnote limiting consequential and incidental damages. In addition to these undisputed facts, Signature introduced evidence—and numerous deponents confirmed—that it is common industry standard procedure for (1) an FBO to present a landing card to the pilot of an arriving non-commercial flight; (2) a pilots to interact FBO employees regarding the landing card and arranging services for the aircraft; and (3) a pilot, or other non-aircraft owner, to execute a landing card. ECF No. 71-8 at 28; ECF No. 71-10 at 13, 14, 17; ECF No. 70 at 5. Moreover, there is no evidence in the record that Signature was notified that the flight at issue here deviated from these established and agreed-upon standards or, more specifically, that Troncone lacked authority to execute the Landing Card on behalf of Marino, 60-206, LLC, or GLF Air, LLC. In

fact, Troncone himself testified that there were no documents reflecting the fact that he did not have authority to act as an agent of the owner. ECF No. 71-10 at 26, 27.

Instead of genuinely disputing these facts, Starr concedes them. For example, Marino testified that he left immediately when the Learjet arrived in Las Vegas and that he has never seen a landing card. ECF No. 70-1 at 142. Albeit reluctantly, Marino additionally testified that he relied on someone else to interact with Signature upon arrival and that he could not think of anyone else other than the aircraft owner for which a pilot might execute a landing card. *Id*. at 142–45. Also, as previously noted, the contract pilots deposed in this case agreed that an FBO landing card is normally executed by the pilot and, further, executed on behalf of the aircraft owner when the owner is a passenger on the flight. ECF No. 71-8 at 16, 17; ECF No. 71-10 19, 20. This is the precise situation here: Troncone executed Signature's Landing Card upon arrival of a flight carrying Marino, the Learjet owner. With these undisputed facts, and others previously mentioned, Signature has shown that (1) it subjectively believed that the Troncone had authority to act for the Learjet owner, and (2) its subjective belief in the pilot's authority was not only objectively reasonable, but an industry standard.

Alternatively, Starr claims that Signature's reliance supporting apparent authority was not reasonable because there was no act of the principal on which it could rest its theory of apparent authority. Here, it is largely undisputed that the only representative from the Learjet Signature communicated with was the pilot Troncone and that Marino did not communicate with anyone from Signature. However, Starr's argument overlooks an obvious fact: Marino placed Troncone in a position of authority by allowing him to pilot the Learjet from Florida to Las Vegas. Although intermediaries like GLF Air, LLC, Young, and Gomez made the technical arrangements that physically placed Troncone at the helm of the Learjet, each of those entities and persons acted on behalf of Marino and 60-206, LLC. As Marino testified, he used GLF Air, LLC to make the Learjet operational and to organize flights. Thus, Marino's act of using GLF Air, LLC, which resulted in Young arranging for Gomez to find Troncone to pilot the flight, are all acts clearly traced back to the principal on which Signature reasonably relied. While there is evidence in the record that Troncone and Marino had never met, Marino ultimately placed Troncone in a place of authority

1 as pilot of the Learjet. As such, Troncone was subject to Marino's control while performing acts
2 related to the job he was hired to do as well as acts that would be required for him to complete to
3 carry out his objective.

4       Starr additionally argues that Troncone did not have authority to agree to the limitation of
5 liability footnote because Troncone himself and Marino both believed he did not. While this
6 testimony exists in the record, it is the relying party's subjective belief, not the principal or agents,
7 that is the inquiry of apparent authority. *See PetSmart*, 137 Nev. at 733. Moreover, Starr's
8 argument that the pilot lacked authority because the Learjet owner Marino never communicated to
9 Signature that Troncone had authority is unpersuasive and unsupported by law as "a principal can
10 hold its agent out as possessing authority through silence." *W. Nevada Precious Metals, Corp. v.*
11 *Sunago*, Case No. 2:05-CV-00886-RLH-GWF, 2007 WL 710187, at *3 (D. Nev. Mar. 5, 2007)
12 (reasoning that the lack of direct communication from a principal to a relying party strengthened
13 the inference of agency because the alleged agent's interaction with the relying party obviated the
14 need for direct communication between the principal and relying party) (citing *Goldstein v. Hanna*,
15 635 P.2d 290, 292 (Nev.1981)).

16       Because there is insufficient evidence present to require that the question of agency be
17 forwarded to a jury and, more pointedly, because the facts supporting the existence of apparent
18 agency are not disputed, the Court finds that summary judgment is appropriate. *See Schlotfeldt*,
19 112 Nev. at 47. Here, Marino ultimately placed Troncone in a position of authority as a pilot for
20 the Learjet on its flight from Florida to Las Vegas, a flight on which Marino was a passenger. As
21 such, Marino cloaked Troncone with apparent authority to act on his behalf and handle every
22 aspect of the flight including its post-arrival parking and storage transaction with Signature. There
23 is no genuine dispute then that Troncone had apparent authority to bind Marino and 60-206, LLC
24 to Signature's Landing Card including the valid limitation of liability clause footnote because a
25 principal "is estopped from later denying the actions of the agent" once he "cloaks the agent with
26 the apparent authority to act[.]" *See Forrest Tr. v. Fid. Title Agency of Nevada, Inc.*, 281 P.3d
27 1173, 2009 WL 3190357, at *1, 2 (Nev. 2009) (concluding an individual had apparent authority
28 to act on behalf of a trust where the trustor placed him a position to handle and arrange trust

transactions, including the litigation-underlying transaction for which the individual selected and interacted with the title company and handled the transaction through the close of escrow) (citing *Ellis v. Nelson*, 68 Nev. 410, 418 (1951)). With apparent authority clearly established, the Court need not analyze whether the pilot had actual authority to bind Marino or 60-206, LLC because the "legal consequences of an agent's actions may be attributed to a principal when the agent has actual authority (express or implied) *or* apparent authority." *See Salyers*, 871 F.3d at 940 (citation omitted) (*emphasis* added). For these reasons, the Court finds that the terms of the Landing Card are an enforceable contract, including the limitation of liability footnote at issue. On the issue of liability for the Other Damages then, Signature is not liable under the terms of the Landing Card. For these reasons and on these issues, the Court grants Signature's motion for summary judgement and denies Starr's motion for summary judgment as to the same.

## IV.   CONCLUSION

IT IS THEREFORE ORDERED that Starr's motion for summary judgment (ECF No. 70) is **DENIED**.

IT IS FURTHER ORDERED that Signature's motion for summary judgment (ECF No. 71) is **GRANTED**. Under the valid limitation of liability footnote in the Landing Card, an enforceable contract as against Marino, 60-206, LLC, and GLF Air, LLC, Signature is not liable for the Other Damages. As indicated by the parties then, there is no need to conduct discovery on damages (ECF No. 40 at 3).

The Clerk of the Court is directed to enter judgment accordingly and close this case.

IT IS SO ORDERED.

DATED this 28th day of March, 2024.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE